# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 102

APRIL TERM, A.D. 2021

September 20, 2021

IN THE MATTER OF THE
GUARDIANSHIP OF ARB, a minor child:

HAROLD BUMGUARDNER and
STEPHANIE BUMGUARDNER,

Appellants
(Respondents),

v.                                                      S-21-0005

CHRISTINA HOUK f/n/a CHRISTINA
THONACK,

Appellee
(Petitioner).

*Appeal from the District Court of Goshen County*
*The Honorable Patrick W. Korell, Judge*

*Representing Appellants:*
    James A. Eddington of Jones, Eddington & Sturgeon, Torrington, Wyoming.

*Representing Appellee:*
    Linda J. Steiner and Abigail E. Fournier of Steiner, Fournier & Zook, LLC, Cheyenne, Wyoming.

*Before FOX, C.J., and DAVIS\*, BOOMGAARDEN, and GRAY, JJ., and HEALY, D.J.*

*\*Chief Justice at time of brief-only conference.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]   The district court appointed grandparents Harold and Stephanie Bumguardner as co-guardians of the minor child (ARB) with his parents' consent.  Over three years later Christina Houk (Mother) petitioned to terminate the guardianship, which the Bumguardners opposed.[1]   Following an evidentiary hearing, the court ordered the guardianship to terminate upon completion of a transition plan.  On appeal the Bumguardners claim that exceptional circumstances warranted continuation of the guardianship.  We affirm.

*ISSUE*

[¶2]   Did the district court err when it determined that exceptional circumstances did not warrant continuation of the guardianship?[2]

*FACTS*

[¶3]   In June 2014, Mother, Father, and the Bumguardners petitioned the district court to appoint the Bumguardners as ARB's co-guardians.  Their petition stated that the guardianship was in ARB's best interests and "necessary for school and medical purposes."  Mother and Father each signed a consent approving the appointment.  Later that month, the court granted the petition and appointed the Bumguardners as co-guardians.

[¶4]   In October 2017, Mother petitioned the court to terminate the guardianship because it was no longer necessary—she had a stable home, had stable employment, and could care for ARB on her own; she was fit to parent; and it was in ARB's best interests to live with her.  The Bumguardners opposed termination on two grounds: first, Mother was unfit to parent and, second, exceptional circumstances warranted continuation of the guardianship.

[¶5]   The court held a two-day evidentiary hearing on February 28 and March 1, 2019, where the facts were largely undisputed.  Over a year later, in April 2020, it issued a

_____

[1] ARB's natural father (Father) also opposed termination but he did not appeal.

[2] Mother argues that the court erred when it imposed the transition plan but she did not cross appeal.  Thus, we will not consider her argument, which seeks to change the judgment.  *See, e.g.*, *Zupan v. Zupan*, 2016 WY 78, ¶ 15, 377 P.3d 770, 776 (Wyo. 2016) ("The distinction between arguing in brief and cross-appealing generally is that a cross-appeal is required to win a change in the judgment, while arguments to support the judgment can be made without a cross-appeal." (citation omitted)).  Moreover, any issue concerning the transition plan may be moot.  *See, e.g.*, *Powder River Basin Res. Council v. Wyoming Dep't of Env't Quality*, 2020 WY 127, ¶ 10, 473 P.3d 294, 297 (Wyo. 2020) ("A case is moot when the determination of an issue will have no practical effect on the existing controversy.").  The transition plan extends through Summer 2021, when the Bumguardners are entitled to a two week visit with ARB.  If the Bumguardners have already exercised summer visitation then there does not appear to be anything left for the parties to do before the guardianship terminates, and any decision about the transition plan would have no practical effect.

decision letter terminating the guardianship effective upon completion of a transition plan. The transition plan extended from May 2020 through Summer 2021. It outlined how Mother, Father, and the Bumguardners would exercise visitation with ARB each month from May 2020 through May 2021, including on holidays and by phone. It also allowed the Bumguardners two weeks of visitation with ARB during Summer 2021. Finally, it addressed counseling, deviation from the plan, involvement of a guardian ad litem, and ARB's participation in various activities.

[¶6]   Almost five months after issuing its decision letter, the court issued a corresponding order and the Bumguardners timely appealed.

## DISCUSSION

[¶7]   The standard under which we review both establishment and termination of guardianships is well settled:

> We presume the district court's findings of fact are correct and will not set them aside unless they are inconsistent with the evidence, clearly erroneous or contrary to the great weight of the evidence. *KO v. LDH* (*In re MEO*), 2006 WY 87, ¶ 17, 138 P.3d 1145, 1150 (Wyo. 2006). We review a district court's conclusions of law *de novo. Id.*

*In re SRB-M*, 2009 WY 22, ¶ 8, 201 P.3d 1115, 1117 (Wyo. 2009) (termination); *In re Guardianship of JR*, 2016 WY 37, ¶ 7, 368 P.3d 910, 911 (Wyo. 2016) (establishment).

[¶8]   "Guardianship matters are controlled and governed exclusively by statute." *MEO*, ¶ 18, 138 P.3d at 1150 (citation omitted). The governing statute in this case states that "[a] guardianship shall cease . . . [u]pon determination by the court that the . . . guardianship is no longer necessary[.]" Wyo. Stat. Ann. § 3-3-1101(a)(v) (LexisNexis 2021). We addressed the burden of proof under this statute in *SRB-M*, ¶¶ 10–24, 201 P.3d at 1118–21.

[¶9]   If a parent who was never adjudicated to be unfit establishes that the guardianship is no longer necessary, the parental preference principle applies and the parent is presumed to be the child's guardian. *See id.* ¶¶ 23, 24, 201 P.3d at 1121. The burden then shifts to the nonparent to rebut the presumption by proving, by a preponderance of the evidence, that the parent is unfit. *See id.*[3] "This allocation of the burden of proof is consistent with the policy underlying the establishment of guardianships and the constitutional protections

---

[3] Effective July 1, 2019, the guardianship statutes provide that "[u]pon the filing of a petition for termination of guardianship by a parent, the court shall consider the best interests of the child while giving deference to the rebuttable presumption that a fit parent is entitled to custody of their child." Wyo. Stat. Ann. § 3-3-1107(a) (LexisNexis 2021). This statute went into effect after Mother filed her petition in October 2017.

afforded a child's biological parent." *Id.* ¶ 24, 201 P.3d at 1121; *see also MEO*, ¶ 21, 138 P.3d at 1152 (discussing these constitutional protections).

[¶10]  We have recognized narrow exceptions to the principle that a fit parent is entitled to custody of her child. *See MEO*, ¶ 50 n.14, 138 P.3d at 1159 n.14; *SRB-M*, ¶ 21, 201 P.3d at 1120.  Most recently, we stated:

> [T]he termination of an established guardianship may raise concerns that do not arise when a guardian is appointed, specifically, the fact that a child may have been in a guardian's custody for many years, may be strongly attached to the guardian, and may experience significant emotional turmoil if removed from the guardian's custody.  In light of these concerns, we reiterate our statement in *MEO*, 138 P.3d at 1159 n. 14, that under "exceptional circumstances" or for "compelling reasons" exceptions may be made to the principle that a fit parent is entitled to custody of his or her child. "Generally, these exceptions acknowledge a child's real family unit or emotional attachment, or take account of a biological parent's failure to accept parental responsibility." *Id.*, citing *Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277, 284 (1976), where a child was in the custody of a non-parent for so long that his removal risked causing him psychological trauma and *Barstad v. Frazier*, 118 Wis.2d 549, 348 N.W.2d 479, 489 (1984), in which the court found "compelling reasons" to include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other extraordinary circumstances drastically affecting the welfare of the child.

*SRB-M*, ¶ 21, 201 P.3d at 1120.[4]

[¶11] Applying these burdens and considering these exceptions, the district court determined: (1) Mother proved that the purposes for which the guardianship was established no longer existed; (2) the Bumguardners failed to prove Mother was unfit; and (3) exceptional circumstances did not support continuation of the guardianship beyond the

---

[4] Our use of these exceptions to date is limited.  *See MEO*, ¶ 50 n.14, 138 P.3d at 1159 n.14 (noting that the exceptions and the rationale supporting them had not been presented to us for consideration and did not appear applicable to MEO's circumstances so we did not address them further); *SRB-M*, ¶ 22, 201 P.3d at 1120 (explaining that we were not persuaded from the record that the case involved the sort of exceptional circumstances or compelling reasons warranting an exception to the rule that a fit parent is entitled to custody of his or her child).

transition period.[5]  The Bumguardners challenge the court's exceptional circumstances determination.  However, we conclude that the court did not err.

[¶12]  We begin by observing that many of the circumstances that could justify the exceptions are not present here.  *See MEO*, ¶ 50 n.14, 138 P.3d at 1159 n.14; *SRB-M*, ¶ 21, 201 P.3d at 1120.  The district court's exceptional circumstances determination therefore is consistent with the record in this regard.  For example, ARB does not have one "real family unit," he has three: the Bumguardners, Mother's family, and Father's family.  Similarly, ARB is emotionally attached not only to the Bumguardners, but also to Mother and Father.  Lastly, Mother did not fail to accept parental responsibility.  Her consent to the guardianship comported with the very reason guardianships exist.

> A guardianship is no more than a temporary custody arrangement established for the well-being of a child.
>
> . . . .
>
> [G]uardianships give parents an opportunity to temporarily relieve themselves of the burdens involved in raising a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future.
>
> [G]uardianships are intended to encourage parents experiencing difficulties to temporarily turn over the custody and care of their children—safe in the knowledge that they will be able to regain custody in the future.

*SRB-M*, ¶ 20, 201 P.3d at 1120 (quoting *Carla R. v. Tim H. (In re D.J.)*, 268 Neb. 239, 682 N.W.2d 238, 246 (2004)).[6]  During the guardianship, she regularly communicated and engaged in meaningful visitation with ARB; she offered the Bumguardners money to help

---

[5] To the extent the district court's decision may suggest that a transition plan may not be imposed absent compelling circumstances, our precedent instructs otherwise.  *See SRB-M*, ¶ 26, 201 P.3d at 1121 (reversing the district court's order continuing the guardianship, remanding for the court to determine whether the nonparent met her burden to prove Mother unfit, and noting that the "court retain[ed] the discretion to enter a reasonable order to assist the child in the transition from [the nonparent's] home to Mother's home").

[6] The Bumguardners ask us to accept and apply the North Dakota Supreme Court's statement in *In re Guardianship of Barros*, 2005 ND 122, ¶ 11, 701 N.W.2d 402, 407 that a "voluntary guardianship creates an 'exceptional circumstance' that triggers the best interest of the child test."  We decline for the simple reason that the North Dakota Supreme Court overruled that case and expressly held that "exceptional circumstances do not exist as a matter of law when a parent seeks termination of a voluntary guardianship and the juvenile court finds the original impediments have been removed."  *Int. of G.L.*, 2018 ND 176, ¶ 11, 915 N.W.2d 685, 689.

support ARB when she became financially stable, but they refused; and she provided for ARB when he visited her home.

[¶13]  Given these circumstances, the Bumguardners rely on their expert, who, according to them, established that ARB's removal from their home risked causing him psychological trauma.  *See SRB-M*, ¶ 21, 201 P.3d at 1120.  Their argument presents a pinched interpretation of the evidence the district court weighed before finding no exceptional circumstances warranted continuation of the guardianship.

[¶14]  The Bumguardners' expert, Debra Ochsner, engaged in family counseling with the Bumguardners and ARB for approximately one year, from January 2018 through February 2019.  Mrs. Bumguardner initiated counseling because ARB had anxiety about going back and forth between their home, Mother's home, and Father's home.  Ms. Ochsner met with ARB, Mrs. Bumguardner, and Mr. Bumguardner individually and in various combinations, but counseling always focused on what was best for ARB.

[¶15]  Much of Ms. Ochsner's testimony reflected favorably on the Bumguardners.  In her opinion, ARB was in a very good place physically, psychologically, and socially.  Physically he was healthy and well cared for.  Psychologically he was "figuring things out"—"[w]hat to do, what not to do, how to word things, how to express himself."  Socially he had great relationships, including a large supportive family and friends at school.  She opined that the Bumguardners were ARB's "biopsychosocial parents"—he did not have the same type of connection with Mother.

[¶16]  When asked what would happen if the court removed ARB from the Bumguardners' home, she identified a continuum along which ARB would probably move up and down over time.  However, she expressed concern about ARB's initial reaction:

> But what we do know is there would be -- there would be serious psychological damage initially.  It would be like the death of a life as you know it.  There's a mourning process.  To move from something you've known for I think we could say safely 90 percent of his life, to move to something different when you're doing well, we could expect the gamut.  Anger, depression, acting out, decreased school performance, breaking of rules.  Lack of sleep[.]

[¶17]  The court plainly afforded considerable weight to, and thus heeded, Ms. Ochsner's opinion that a sudden change in custody would negatively affect ARB.  It noted that "[t]he transition from one home to another would certainly be stressful" and, "[a]s [Ms. Ochsner] suggested, ARB would experience the death of the life as he knows particularly in an abrupt change."  It found that a lengthy transition plan would accomplish ARB's best interest.

5

Then it crafted a plan that gradually transitioned custody from the Bumguardners to Mother.

[¶18] It is equally plain the court afforded less weight to Ms. Ochsner's opinions about whether the guardianship should continue because those opinions suffered foundational problems. For example, voir dire and cross-examination by Mother's counsel revealed that Ms. Ochsner based her opinions on information she obtained from the Bumguardners, ARB, and one of ARB's teachers. She did not speak to Mother at length, visit Mother's home, talk to Mother's husband or stepchildren, or observe Mother interact with her stepchildren or ARB. Ms. Ochsner had no opinion whether Mother could provide for ARB spiritually, educationally, or emotionally. Nor did she have an opinion whether Mother could provide ARB unconditional love.

[¶19] The court highlighted those problems, along with other concerns, in the course of concluding that compelling circumstances did not warrant continuation of the guardianship. It stated:

> [T]he counselor's opinions regarding ARB are largely based on her interactions with ARB and information provided by [the Bumguardners]. Counselor was unaware of Mother's situation through independent means such as speaking with Mother personally. Mother made attempts to seek the help of Counselor which were almost entirely rebuffed. Rather than be inclusive, the counselor deferred to being retained as a family counselor to the Bumguardner[s] and individually to ARB. She declined to answer certain questions at [hearing] because of privity with the Bumguardners. The counselor also unfortunately viewed Mother's attempted contact with her as a weakness of uncertainty because Mother was unsure of her parenting skills. This has caused Mother to become hesitant to accept counselor's thoughts and recommendations.

From there the court determined that a transition plan was in ARB's best interests.

[¶20] We will not encroach on the district court's ability to assess credibility and weigh evidence. The district court, as the trier of fact, had to decide what weight to give Ms. Ochsner's expert testimony. *See Street v. Street*, 2009 WY 85, ¶ 23, 211 P.3d 495, 503 (Wyo. 2009) (citation omitted). Because it heard and saw the witnesses, it was "to be sure, the first and best judge of the weight and value to be given to all of the evidence, both expert and non-expert." *Id.* (citation omitted). On determining that Ms. Ochsner qualified as an expert, the court expressly noted for the record that it would weigh her opinions based on their foundation. Its decision letter reflects that it did just that, weighing Ms. Ochsner's opinions against the governing principle that a fit parent is entitled to custody.

6

[¶21]   Turning to the remaining circumstances that might justify an exception to that principle, the district court recognized that Mother never abandoned ARB.  *See SRB-M*, ¶ 21, 201 P.3d at 1120.  To the contrary, she maintained a relationship with ARB throughout the guardianship, with frequent communication and meaningful visitation.  The evidence reflected that early in the guardianship Mother had a "date night" with ARB each week as well as weekend visits when the Bumguardners allowed; she and the Bumguardners generally split holidays.  In 2017, she still had a date night with ARB each week, along with weekend visits when ARB's activities permitted.  Following mediation in 2018, Mother had about the same amount of time with ARB but a more certain schedule consisting of every Thursday night and third weekend.  She also had ARB for a week in August when she got married and for the first half of Christmas break.  This evidence supports the district court's no exceptional circumstances finding.

[¶22]   We further observe it was the Bumguardners and the court, not Mother, who extended the amount of time that ARB lived with the Bumguardners.  *See SRB-M*, ¶ 21, 201 P.3d at 1120.  Mother testified that she began to believe that the guardianship was no longer necessary about six months to a year after its establishment, when her life began stabilizing.  She had several conversations with Mrs. Bumguardner about terminating the guardianship and they generally agreed that a gradual transition would be best for ARB.  When a transition did not materialize, Mother petitioned to terminate the guardianship in October 2017, approximately 28 months after its establishment.  From there, it took 16 months for the case to go to hearing, another year for the court to issue its decision letter, and another five months for the court to issue its order.[7]  To find exceptional circumstances based on how long ARB has been in the Bumguardners' custody would disregard Mother's efforts to terminate the guardianship.  It might also incentivize guardians to prolong termination proceedings to maintain custody of a child.

[¶23]   Finally, relying almost exclusively on Mother's circumstances leading up to and in the early stages of the guardianship, the Bumguardners contend that Mother's "unstable lifestyle" warranted continuation of the guardianship.  Here again, the evidence the district court considered was not so narrow.

[¶24]   The district court recognized that Mother "has admittedly made mistakes in her past, and she appears to have lacked stability for a period of time before and after the establishment of the guardianship."  More specifically, it noted:

---

[7] These delays are troubling, as the matter was legally uncomplicated, involved a child, and involved Mother's fundamental right to custody of her child.  *See Castellow v. Pettengill*, 2021 WY 88, ¶ 9, 492 P.3d 894, 897 (Wyo. 2021) ("Although in a different context, we have noted a particular concern when courts delay matters involving children." (citation omitted)); *id.* ¶¶ 17–30, 492 P.3d at 901–04 (Kautz, J., specially concurring) (discussing the fundamental need for courts to timely resolve cases and calling on "Wyoming's judiciary to adopt specific timelines for both completion of court proceedings and issuance of decisions").

The record is replete with Mother's struggles since the child's birth. She had tumultuous relationships, including one with Father. Some of those relationships resulted in episodic domestic violence and the abuse of ARB. She changed residences perhaps as many as ten times. Mother began frequently going out with friends and consuming alcohol. While Mother has always remarkably maintained employment, her employers varied. On one occasion, she was terminated from employment due to tardiness resulting from her inability to make it to work. She was strapped financially as her income was consumed by her bills and expenses. She received $300 in total child support from Father pursuant to their Court order. She grappled with depression.

But these observations do not tell the whole story.

[¶25] The court also found that, "at the time of the hearing, [Mother] ha[d] made exceptional progress in establishing a stable environment" for ARB. The evidence reflected that she had been in a consistent relationship with her husband since 2016 and they had been married since August 2018. She was the loving stepmother to his three children, who lost their mother in an accident several years prior. The family lived in a five-bedroom house where ARB had his own room. Mother had worked for the Stacey Houk Family Enrichment Center for almost three years. Among other things, the center helped struggling families in the community find resources. She currently worked as the Director of Operations. Mother no longer abused alcohol; she had addressed her depression with medication and learned other coping mechanisms to manage it. This finding is not contrary to the great weight of the evidence, which shows that Mother was a fit parent when the voluntary guardianship was established, the guardianship was no longer necessary, Mother was a fit parent at the time of the hearing, and no "exceptional circumstances" or "compelling reasons" warranted an exception to the principle that a fit parent is entitled to custody of her child.

[¶26] Affirmed.