# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 97

**APRIL TERM, A.D. 2022**

August 16, 2022

IN THE MATTER OF THE
GUARDIANSHIP OF:  GAP, EJM and
MCM, minor children,

JOHN KENNEDY and CAROL LINDA
PADILLA KENNEDY,

Appellants
(Respondents),

v.                                                                                S-21-0292

GILBERT PADILLA and JESSICA
PADILLA,

Appellees
(Petitioners).

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellants:*
    Seth Shumaker, Sheridan, Wyoming.

*Representing Appellees:*
    Geneva Engelhart, Casper, Wyoming.

*Guardian ad Litem:*
    No appearance.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    A Colorado court removed GAP, MCM, and EJM from Jessica and Gilbert Padilla's custody and placed them in foster care in 2015.  In 2016, the court granted Carol "Linda" Padilla Kennedy and John Kennedy, Gilbert's sister and her husband, guardianship of all three children.  In 2020, the Padillas, who are GAP's biological parents and MCM's and EJM's relatives and former guardians, petitioned the Wyoming district court to terminate the Kennedys' guardianships.  Following a hearing, the court terminated the Kennedys' guardianships of GAP and MCM and granted the Padillas guardianship of MCM.  The Kennedys appeal, challenging the court's application of the guardianship statutes and best interest findings.  We affirm.

*ISSUES*

[¶2]    We rephrase the issues as:

> I. Did the district court err when it terminated the Kennedys' guardianship of GAP?
>
> II. Did the district court err when it terminated the Kennedys' guardianship of MCM and granted guardianship to the Padillas?

*FACTS*

[¶3]    Jessica and Gilbert Padilla, who married in July 2011, have one biological child, GAP, born in January 2011.  In 2013, Jessica obtained guardianship over her two younger half siblings, EJM and MCM, born in 2005 and 2006, respectively.[1]  At that time, the Padillas and the three children lived in Fort Collins, Colorado, where the couple owned a home and Gilbert worked at a car dealership.

[¶4]    After a series of unfortunate events that included Gilbert sustaining a work injury and losing his job, the family moving into a camper, Gilbert and Jessica using methamphetamine, Gilbert getting arrested for DUI and child endangerment, and the children being left unattended during Gilbert's arraignment, the State of Colorado removed all three children from the Padillas' care in July 2015.  The children were placed in Colorado foster care and later adjudicated dependent and neglected.

---

[1] Jessica, EJM, and MCM have the same father.  EJM and MCM's mother is not in their lives.  The two children, who previously lived in Utah, came to reside with the Padillas due to their father's alcohol and substance abuse and legal troubles.

1

[¶5]    The Colorado court ordered the Padillas to complete a treatment plan before they could regain custody of the children.  Though they had visitation with the children during this time, they ultimately failed to complete their plans, and the Colorado Department of Family Services sought a permanent placement for the children.  In December 2015, the children went to live with Gilbert's sister and her husband, the Kennedys, in Casper, Wyoming.  The Padillas agreed with this placement.[2]

[¶6]    In March 2016, the Padillas encountered more legal trouble.  After leading officers on a high speed chase in Fort Collins, Jessica was charged with eluding and misdemeanor possession and Gilbert was charged with criminal impersonation for giving officers a fake name.  Upon their convictions, Gilbert was sentenced to three years of probation and Jessica was sentenced to three years at a halfway house.  Jessica failed to complete her sentence at the halfway house and went to prison in 2017 before being released on parole.

[¶7]    Meanwhile, in September 2016, the Colorado court found that Jessica and Gilbert were "unable to parent the children" and issued permanent orders allocating parental responsibilities for all three children to the Kennedys.[3]  The court left the Padillas' visitation with the children to the Kennedys' discretion.

[¶8]    In May 2019, after completing their probation and parole obligations, the Padillas moved to Casper to be closer to the children.  At first, they had some visitation with the children with the Kennedys present.  The parties had differing accounts of how these visits went.  Jessica and Gilbert claimed that Linda limited their contact with the children and often disciplined the children for showing them affection.  Linda stated that Jessica exhibited bizarre behavior during the visits, and that Jessica and Gilbert fought in front of the children and upset them.  Linda eventually cut off contact with the Padillas,[4] and allowed them only phone contact with the children.

[¶9]    MCM began exhibiting behavioral issues in 2019.[5]  She began contacting other biological family members in Utah, acting out against Linda, and running away.  On one occasion, she ended up at the Padillas' home and told them about her conflict with Linda.  The Padillas called law enforcement and DFS, who responded, inspected their home, and determined it would be okay for MCM to stay there, but Linda did not allow it.  By the time this case went to a hearing in 2021, MCM had run away from the Kennedys' house at

---

[2] Jessica and Gilbert had moved in with the Kennedys in September 2015.  Linda employed them at her company and gave the Padillas money so they could visit the children in Colorado.  Jessica and Gilbert moved out of the Kennedys' home and back to Colorado before the children moved in with the Kennedys.

[3] These orders were registered as orders of guardianship in Wyoming in October 2020.

[4] Tensions were mounting for other reasons during this time, as Gilbert and Jessica had gone back to work for Linda when they returned to Casper in 2019.  Linda fired Jessica after only a few months, again claiming she was exhibiting bizarre and dangerous behavior.  Gilbert either quit or was fired shortly thereafter.

[5] By the time of the hearing in 2021, MCM had been diagnosed with reactive attachment disorder, major depressive disorder, and oppositional defiant disorder.

least three times; and had been admitted to the Wyoming Behavioral Institute seven or eight times, the Youth Crisis Center four or five times, and a few other institutions.

[¶10] The Padillas filed their petition to terminate the Kennedys' guardianships in July 2020. As to GAP, they argued his guardianship was no longer necessary and should be terminated because they were "fit and competent to provide care for" him. Their petition stated they had each been sober for over three years; they had attended treatment programs and sought counseling; they had suitable, stable housing; Gilbert had obtained stable employment at the Wyoming Rescue Mission; and they had both completed anger management classes, parenting classes, and marriage counseling. As to EJM and MCM, they maintained it was in the children's best interest to have the Padillas "appointed as their guardians[.]" They claimed they were "fit and proper" to have guardianship and the Kennedys were not acting in the children's best interest, as the children were isolated, emotionally abused, and not receiving proper medical care.

[¶11] The Kennedys opposed the petition, denying the allegations against them and asserting t the Padillas were not recovered and were "[in]capable of caring for a child." They maintained it was in all three of the children's best interests to continue the Kennedys' guardianships. The district court appointed a Wyoming guardian ad litem (GAL) in April 2021.

[¶12] The court heard testimony from several witnesses at the August 2021 hearing.[6] The Padillas' mental health nurse practitioner, Peter Dahlberg, testified to the progress Jessica and Gilbert had made. He stated that Jessica was receptive to and engaged in her therapy and her mental health had stabilized, and Gilbert responded very quickly to therapy and had shown success and stability both at work and personally. Gilbert and Jessica each testified they had been sober since March 2016, had made significant progress on their mental health through counseling and other programs, and had maintained a stable residence for two years. They expressed they were fit and able to be parents again.

[¶13] Gilbert also testified he was working as a case manager at the Wyoming Rescue Mission and starting school that fall to obtain his bachelor's degree in addiction counseling. When asked about Linda committing MCM to the Wyoming Behavioral Institute's acute unit, Gilbert expressed concern and stated his belief that she does not need to be there. He explained they had explored options for MCM, including the residential program through the Youth Crisis Center and another program through the Mercer House that, along with counseling, would be aimed toward getting her back home if they became her guardians. He also stated he understands that GAP may have some anger toward him and Jessica, and

---

[6] The court heard from twelve witnesses in total: Gilbert and Jessica; their mental health nurse practitioner; Gilbert's boss at the Wyoming Rescue Mission; Jessica's sister; Linda; EJM; the children's therapist; MCM's social worker; the children's Colorado GAL; and two Wyoming police officers who had contact with the family.

3

because of that, he agreed both individual and family counseling would be important and a plan to gradually transition him back into their custody might be necessary. Lastly, he testified they had already considered schools and medical providers for GAP.

[¶14] Gilbert's boss at the Wyoming Rescue Mission, Dave Matthews, testified Gilbert had been working for him for two years, had passed his random drug tests at work, was doing really well, and had been promoted. He described Gilbert as "[g]enuine, sincere, caring, [and] compassionate[.]" Jessica's sister, Jamie Cook, testified she spoke with Jessica every day and had seen a lot of growth in her. She stated Jessica was strong, loving, and just wanted to be a mom again. Furthermore, Jamie testified the children expressed to her their desire to have more contact with her and their other family members, but Linda had largely prevented that contact.

[¶15] Linda testified she had been helping the Padillas since before their legal troubles began. And, though she admitted to having minimal contact with the Padillas in the years before the hearing, she stated she did not believe they had changed—she believed they still used drugs and alcohol and engaged in domestic violence. She claimed it took her six years to get the children comfortable and stable. As to MCM, she believed her biological family in Utah encouraged her to act out while in the Kennedys' care. She testified MCM needs a structured environment, and she plans to send her to a facility in Missouri once they have room for her. MCM's social worker at the Wyoming Behavioral Institute, Cecelia Stark, testified MCM's issues with Linda were a "central theme" in MCM's treatment, but she believed t Linda had MCM's best interests in mind.

[¶16] The children's therapist, Frank Shablo, testified to each child's stance on the guardianship matter. He stated EJM and GAP had told him they did not want to return to the Padillas' custody, and GAP was well-adjusted and felt safe with the Kennedys. MCM, however, had expressed to him she wanted the Padillas to be her guardians. EJM, who was 16 at the time of the hearing, testified last. He stated the Kennedys never treated him poorly and he was happy living with them. The Padillas ultimately conceded EJM should be allowed to remain with the Kennedys and only asked that they be allowed to have contact with him.

[¶17] At the close of the hearing, the GAL recommended that, if the court finds the Padillas fit, it should impose a gradual transition plan to ease GAP back into their custody. As to MCM, the GAL explained she communicated frequently with her counselors and therapists and they all disagreed with Linda's plan to send MCM to the Missouri facility. In her written findings and conclusions to the court, she recommended that GAP's and MCM's guardianships be terminated.

[¶18] Following the hearing, the court terminated the Kennedys' guardianships of GAP and MCM and granted the Padillas guardianship of MCM. The Kennedys appealed both

terminations. Additional facts and district court findings are set out in the discussion of the issues.

### *DISCUSSION*

[¶19]  "Guardianship matters are controlled and governed exclusively by statute." *Matter of Guardianship of ARB*, 2021 WY 102, ¶ 8, 495 P.3d 297, 299 (Wyo. 2021) (quoting *KO v. LDH (In re MEO)*, 2006 WY 87, ¶ 18, 138 P.3d 1145, 1150 (Wyo. 2006)).  To the extent we must interpret the guardianship statutes and determine whether the court correctly applied them, our review is de novo.  *See Ailport v. Ailport*, 2022 WY 43, ¶ 22, 507 P.3d 427, 437 (Wyo. 2022) (citation omitted).  Otherwise, we review both the establishment and the termination of guardianships under the same standard.  *ARB*, ¶ 7, 495 P.3d at 299.  We presume the district court's factual findings "are correct and will not set them aside unless they are inconsistent with the evidence, clearly erroneous or contrary to the great weight of the evidence." *Id.* (quoting *In re SRB-M*, 2009 WY 22, ¶ 8, 201 P.3d 1115, 1117 (Wyo. 2009)).  And we review the court's conclusions of law de novo.  *Id.* (quoting *SRB-M*, ¶ 8, 201 P.3d at 1117).

### *I.     The district court did not err when it terminated the Kennedys' guardianship of GAP.*

[¶20]  Determining whether the district court erred when it terminated the Kennedys' guardianship of GAP, the Padillas' biological child, requires consideration of two statutory provisions.  *See* Wyo. Stat. Ann. §§ 3-3-1101(a)(v), 3-3-1107(a) (LexisNexis 2021).

### **Wyo. Stat. Ann. § 3-3-1101(a)(v)**

[¶21]  Under Wyo. Stat. Ann. § 3-3-1101(a)(v), "[a] guardianship shall cease . . . [u]pon determination by the court that the . . . guardianship is no longer necessary[.]"  The burdens of proof under this statute are well settled.  *See Matter of Guardianship of DEP*, 2021 WY 122, ¶¶ 21–22, 497 P.3d 928, 932 (Wyo. 2021); *ARB*, ¶¶ 8–9, 495 P.3d at 299; *SRB-M*, ¶¶ 10–24, 201 P.3d at 1118–21.[7]

[¶22]  First, the parent seeking termination bears the burden to establish "that the guardianship is no longer necessary[.]"  *See DEP*, ¶ 22, 497 P.3d at 932 (quoting *ARB*, ¶ 9, 495 P.3d at 299).  In past cases, we have found that a parent may establish the guardianship is no longer necessary by showing that the circumstances that gave rise to the guardianship

---

[7] *DEP*, *ARB*, and *SRB-M* all involved parents who were "never adjudicated to be unfit[.]"  We find no basis for applying the § 3-3-1101(a)(v) burdens differently in this case—where a state agency removed the child from the parents' custody and a court determined that the parents were "unable to parent the children"— because a previous finding of parental unfitness has no bearing on whether the guardianship is still necessary at the time of the termination proceedings.  Instead, the circumstances contemporary to the termination proceedings control that determination.

no longer exist.[8]  *See id.* ¶ 23, 497 P.3d at 932 ("The district court implicitly found that [the mother] established the guardianship was no longer necessary for the reason it had been established."); *ARB*, ¶ 11, 495 P.3d at 300 (the mother "proved that the purposes for which the guardianship was established no longer existed"); *SRB-M*, ¶ 24, 201 P.3d at 1121 ("once [the mother] established that the guardianship was no longer necessary for the reasons it had been established . . . [t]he burden then shifted to [the guardian]").  If the parent meets that burden, the "parental preference principle" applies, establishing a rebuttable presumption that the child should be reunited with the parent.  *See DEP*, ¶ 22, 497 P.3d at 932 (citing *ARB*, ¶ 9, 495 P.3d at 299); 29 Am. Jur. 2d *Evidence* § 244, Westlaw (database updated May 2022) ("In guardianship termination proceedings involving a biological [] parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with [their] parent." (footnote omitted)); *see also* 67A C.J.S. *Parent and Child* § 70, Westlaw (database updated May 2022) ("Under the parental preference principle, a parent's natural right to the custody of [their] child trumps the interests of strangers to the parent-child relationship[.]" (citation omitted)).

[¶23]  Once the parental preference principle applies, the burden "shifts to the nonparent to rebut [that] presumption by proving, by a preponderance of the evidence, that the parent is unfit."  *DEP*, ¶ 22, 497 P.3d at 932 (quoting *ARB*, ¶ 9, 495 P.3d at 299).  This shifting allocation of the burdens "is consistent with the policy underlying the establishment of guardianships and the constitutional protections afforded a child's biological parent."  *Id.* (quoting *ARB*, ¶ 9, 495 P.3d at 299); *see also MEO*, ¶ 21, 138 P.3d at 1152 (discussing a biological parent's fundamental right to parent their children).

[¶24]  Following the guardianship hearing in this case, the court determined that "[t]he circumstances that required the guardianship in 2015-2016 no longer exist."  It found:

> The [Padillas] have taken the steps necessary to better their lives since May 2019.  Both [] are clean and sober and actively involved in mental health counseling.  They have a stable home.  Gilbert is gainfully employed and intends to get a BA degree in addiction therapy.  The evidence showed that [the Padillas] can provide a safe home for their child.

Thus, it concluded the Padillas had "met their burden to prove that the guardianship of GAP is no longer necessary."  The record supports this determination, and the Padillas therefore had the benefit of the parental preference principle.

---

[8] We recognize that this showing may not be sufficient to overcome the parent's burden of proving "that the guardianship is no longer necessary" in all cases.  The district court may determine, upon consideration of the parties' evidence, that other circumstances, not explicitly identified at the creation of the guardianship, exist or have arisen that make it necessary to continue the guardianship.

[¶25] Appropriately shifting the burden, the court went on to conclude that the Kennedys failed to demonstrate that the Padillas were unfit to parent. Linda admitted at trial that she had had little to no contact with the Padillas since 2019, and the court found that her testimony that they were "currently unfit was entirely based on speculation and conjecture." Ultimately, it found that Linda had provided "no proof" that the Padillas were using drugs or otherwise unable to "adequately provide the care necessary to GAP." The record again supports the court's findings.

[¶26] Unless the non-parent asserted, at this juncture, that exceptional circumstances existed to outweigh the principle that a fit parent is entitled to custody of their child, *see ARB*, ¶ 10, 495 P.3d at 299–300, *infra* ¶ 32, the court's analysis would have, until recently, ended here. In 2019, however, as the district court recognized, the legislature enacted Wyo. Stat. Ann. § 3-3-1107(a), which requires the court to conduct a best interest of the child analysis in every guardian termination proceeding involving a biological child.

### Wyo. Stat. Ann. § 3-3-1107(a)

[¶27] Wyo. Stat. Ann. § 3-3-1107(a), which applies specifically to the termination of a guardianship of a biological child, provides that "[u]pon the filing of a petition for termination of guardianship by a parent, the court shall consider the best interests of the child while giving deference to the rebuttable presumption that a fit parent is entitled to custody of their child."[9] We have not yet had the opportunity to interpret and apply this statute. *See DEP*, ¶¶ 22–27, 497 P.3d at 932; *ARB*, ¶ 9 n.3, 495 P.3d at 299 n.3.

[¶28] Under the plain language of this provision, courts must consider the child's best interests while giving deference to the parental preference principle. *See* Wyo. Stat. Ann. § 3-3-1107(a). Notably, the legislature declined to enumerate specific factors courts must consider in this best interest determination. *See e.g.*, Wyo. Stat. Ann. § 20-2-201(a) (enumerating factors for a court to consider in determining the best interests of a child in a custody dispute between parents). We have held in such instances that the "court may determine best interests in accordance with its familiar role without considering any particular list of factors." *Ailport*, ¶ 31, 507 P.3d at 439.

[¶29] In crafting this provision, the legislature clearly recognized that "a simple weighing of the best interests of the [child]" would be insufficient to protect a fit parent's fundamental right to care for their child, and it therefore directed courts to give "deference" to that right when determining whether to continue a guardianship. *See id.* ¶ 13, 507 P.3d

---

[9] In their first issue, the Kennedys maintain that the district court "seems" to have erroneously applied a presumption that the Padillas were fit under § 3-3-1107(a) and thereby misinterpreted this statute. We understand the Kennedys' confusion, as the district court provided an imprecise explanation of the burdens in its order but, for the reasons stated above, we conclude that the district court did not simply presume the Padillas were fit—it properly held the Padillas to their burden of demonstrating that the guardianship was no longer necessary under § 3-3-1101(a)(v) because they were fit to care for GAP. *See supra* ¶ 24.

at 434 (explaining the United States Supreme Court's decision about grandparent visitation in *Troxel v. Granville*, 530 U.S. 57, 67, 120 S.Ct. 2054, 2061, 147 L.Ed.2d 49 (2000), where it noted that analyzing the child's best interests alone was insufficient to protect the parent's rights). To give deference, courts must "show[] respect for" or take a "respectful . . . approach . . . toward" a "person or [] institution whose action, proposal, opinion, or judgment should be presumptively accepted[.]" *Deference*, Black's Law Dictionary (11th ed. 2019).

[¶30] This provision therefore requires us to consider a child's best interest while respecting the "presumption that a fit parent is entitled to custody of their child"—and, because a fit parent's right to the care, custody, and control of their child is fundamental, it necessarily carries greater weight. *See SRB-M*, ¶ 18, 201 P.3d at 1119 (noting that because a parent has a fundamental right to "the care, custody, and control" of their children, we generally do not condone the "removal of a child from a fit parent" (citations omitted)). Only in limited circumstances will a child's best interest outweigh a fit parent's fundamental right, and we conclude that, under § 3-3-1107(a), only a showing of harm to the child will justify an infringement of that right.

[¶31] Consequently, in order to show that it is in the child's best interest to continue the guardianship under § 3-3-1107(a), a guardian has the burden to show that termination of the guardianship will be harmful to the child—if the guardian cannot carry this burden, the biological parent is entitled to custody of the child. This interpretation is consistent with other instances in which we have considered what a non-parent must show to override a parent's fundamental right to the care, custody, and control of their child. *See Ailport*, ¶¶ 33, 42, 507 P.3d at 440, 442 (holding that grandparents petitioning for visitation over a parent's objection must demonstrate that the parent is unfit to make visitation decisions or that the child would be harmed by the parent's visitation decision).

[¶32] It is also consistent with our recognition in cases applying the guardianship statutes as they existed prior to the 2019 enactment of § 3-3-1107(a) that there are "narrow exceptions to the principle that a fit parent is entitled to custody of her child." *ARB*, ¶ 10, 495 P.3d at 299 (citing *MEO*, ¶ 50 n.14, 138 P.3d at 1159 n.14; *SRB-M*, ¶ 21, 201 P.3d at 1120). For example, we noted:

> [T]he termination of an established guardianship may raise concerns that do not arise when a guardian is appointed, specifically, the fact that a child may have been in a guardian's custody for many years, may be strongly attached to the guardian, and may experience significant emotional turmoil if removed from the guardian's custody. In light of these concerns, we reiterate our statement in *MEO*, 138 P.3d at 1159 n. 14, that under "exceptional circumstances" or for "compelling reasons" exceptions may be made to the principle

that a fit parent is entitled to custody of his or her child. "Generally, these exceptions acknowledge a child's real family unit or emotional attachment, or take account of a biological parent's failure to accept parental responsibility." *Id.*, citing *Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277, 284 (1976), where a child was in the custody of a non-parent for so long that his removal risked causing him psychological trauma and *Barstad v. Frazier*, 118 Wis.2d 549, 348 N.W.2d 479, 489 (1984), in which the court found "compelling reasons" to include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other extraordinary circumstances drastically affecting the welfare of the child.

*ARB*, ¶ 10, 495 P.3d at 299 (quoting *SRB-M*, ¶ 21, 201 P.3d at 1120). This exceptional circumstances inquiry is now appropriately incorporated into the § 3-3-1107(a) best interest analysis, which requires the non-parent to show that termination of the guardianship will be harmful to the child.

[¶33] The district court, in applying § 3-3-1107(a) prior to our interpretation, looked to the child custody best interest factors in Wyo. Stat. Ann. § 20-2-201 to analyze GAP's best interests. Its findings related to those factors are supported by the record and, we conclude, are sufficient, without need for remand, to demonstrate that the Kennedys failed to establish that GAP would be harmed if the guardianship was terminated.

[¶34] In claiming that the district court's best interest findings were inconsistent with the evidence and clearly erroneous, the Kennedys emphasize that GAP told his counselor he did not want to live with his parents and expressed anger toward them. They maintain that GAP is bonded with them and well-adjusted. They also argue that Mr. Shablo expressed concern about Jessica's ability to be a caretaker, and claim the evidence shows that she struggles with her mental health and the Padillas struggle with domestic violence. They contend that emotional trauma will come to GAP if the guardianship is terminated, as evidenced by the court's order for a reintegration plan.

[¶35] However, the court found that the bulk of the Kennedys' evidence, instead of focusing on the circumstances at the time of the hearing, was "centered around the reasons why the guardianship was granted in the first place." The court declined to give GAP's statements to Mr. Shablo much weight, as it found that "GAP has been denied any meaningful contact with his parents" and it was "clear" the Kennedys had been "influencing him" in that regard. It noted that GAP also told Mr. Shablo he was afraid to see his parents because he thought he might "start liking them again." Additionally, the court explained that Mr. Shablo testified that therapeutic intervention and a reintegration

9

plan were required to "successfully reunify" the family, he offered to facilitate that transition, and the court agreed.

[¶36]   After reviewing the record, and in giving appropriate deference to the Padillas' fundamental right to the care, custody, and control of GAP, we conclude that the district court's best interest findings are not inconsistent with the evidence or clearly erroneous. The Kennedys were unable to show harm would come to GAP if the guardianship terminated, and we therefore affirm the court's decision to terminate their guardianship.

## II.     *The district court did not err when it terminated the Kennedys' guardianship of MCM and granted guardianship to the Padillas.*

[¶37]   The Kennedys also challenge the district court's factual findings in support of termination of their guardianship of MCM.  Because MCM is not the Padillas' biological child, subsection (iv) of the guardianship termination statute more directly applies to her situation.  That provision provides that MCM's "guardianship shall cease . . . upon . . . [a] determination by the court that the guardian . . . is not acting in the best interest of the ward."  Wyo. Stat. Ann. § 3-3-1101(a)(iv).  "In such case, the court shall appoint another guardian[.]"  *Id.*

[¶38]   The Kennedys argue they attended every hearing while the children were in foster care, have provided for MCM since 2015, and have been engaged in her mental health treatment, while the Padillas have been largely absent.  Because of this, they claim the court's findings that they were not acting in MCM's best interest and that the Padillas were a better placement for MCM are inconsistent with the evidence and clearly erroneous.  We disagree.

[¶39]   In terminating their guardianship of MCM, the court first commended the Kennedys for taking on the role when the Padillas were unable to.  It found, however, that the Kennedys had failed to foster any relationship between MCM and the Padillas or any of MCM's other biological family even though the evidence showed MCM wanted those relationships and her mental health issues had stemmed, in part, from her estrangement from her family.  Rather than try to foster those connections for MCM, it found that Linda's response to her issues had been to send her to multiple treatment facilities, and Linda testified she intended to send her to another one, in Missouri, upon availability.  The court noted that the GAL and MCM's counselors disagreed this was the best course of treatment for MCM.

[¶40]   The GAL also recommended termination of the Kennedys' guardianship, explaining she believedt MCM would refuse to work on her mental health issues given her feelings toward Linda.  Lastly, the court explained that MCM had expressed her desire to have the Padillas as her guardians, and given her age, the court determined her preference should carry some weight.  For these reasons, it determined the Kennedys were no longer acting

10

in MCM's best interest, and that it was in her best interest to grant guardianship to the Padillas.

[¶41] The court's findings are supported by testimony at the hearing. *See supra* ¶¶ 13–17. Given MCM's serious issues with the Kennedys, Linda's desire to continue institutionalizing MCM against the advice of the GAL and MCM's counselors, the Padillas' fitness and willingness to take on the role of guardians, and MCM's express desire to live with the Padillas, the district court's findings that the Kennedys were not acting in MCM's best interest and it was in MCM's best interest to live with the Padillas are not inconsistent with the evidence or clearly erroneous. We therefore affirm the court's ruling.

## CONCLUSION

[¶42] The district court correctly applied Wyo. Stat. Ann. § 3-3-1101(a)(v), the statute governing the Padillas' petition to terminate the Kennedys' guardianship of their biological child GAP, in that it required the Padillas to prove the guardianship was no longer necessary and then, once they met their burden, it shifted the burden to the Kennedys to prove the Padillas were unfit to parent GAP. The record supports its determinations that the Padillas met their burden and the Kennedys did not meet theirs.

[¶43] Moreover, though we hold for the first time that § 3-3-1107(a) requires a guardian(s) seeking to continue their guardianship over the biological child of a fit parent(s) to show that termination of the guardianship will be harmful to the child, we conclude the district court's findings are sufficient, without need for remand, to demonstrate that the Kennedys failed to meet this burden. We therefore affirm the court's decision to terminate the Kennedys' guardianship of GAP.

[¶44] Additionally, the court's best interest findings in support of terminating the Kennedys' guardianship of MCM and granting guardianship to the Padillas pursuant to § 3-3-1101(a)(iv) are supported by the record. We therefore affirm the court's decision to terminate the Kennedys' guardianship of MCM.